UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT JACKSON | ) |
| Plaintiff, | ) No. 17-cv-07739 |
| v. | ) Judge Edmond E. Chang |
| THE VILLAGE OF JUSTICE and OFFICER DAMIEN DYAS, | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Robert Jackson brings various civil-rights and state-tort claims against Village of Justice Police Officer Damien Dyas for injuries sustained during an arrest. R. 34, Am. Compl.[1] In addition to the individual claims against Dyas, Carr also seeks to hold the Village of Justice liable for what Dyas did. Specifically, Jackson brings a *Monell* claim against the Village, arguing that Dyas's alleged misconduct was caused in part by the Village's perpetuation of a police code of silence, as well as its failure to adequately train officers on the use of excessive force. 42 U.S.C. § 1983. The Village now moves to dismiss the *Monell* claim against it. R. 49, Mot. Dismiss. (The individual claims against Dyas are not directly at issue in this motion.) For the reasons discussed below, the Village's motion is granted.

---

[1]The Court has federal question jurisdiction under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367. Citations to the record are noted as "R." followed by the docket number, and when necessary, the page or paragraph number.

## I. Background

For the purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In October 2016, Robert Jackson was at his home in Evergreen Park in Cook County, Illinois, when two police officers from the Village of Justice (another suburb within Cook County) showed up at his door. Am. Compl. ¶¶ 8-9. According to Jackson, the two officers were Damien Dyas and an Officer "Malloy" (Jackson does not provide his first name). *Id.* ¶ 9.

Jackson asked the officers why they were at his house. Am. Compl. ¶ 9. The officers told him that they were there to serve an order of protection that had been filed against him. *Id.* ¶ 10. They also told him that he needed to come with them. *Id.* In response, Jackson asked whether there was a warrant for his arrest. *Id.* ¶ 11. The officers replied no, but maintained that Jackson needed to come with them because they had an order of protection to serve him. *Id.* ¶ 12. Jackson then asked if he could see the order. *Id.* ¶ 13. He also told the officers that there was no reason for him to come with them if he was not under arrest, but that he would be willing to "make an appointment to come down and speak with them accompanied by his parole officer or his attorney." *Id.*

All of a sudden, the officers grabbed Jackson. Am. Compl. ¶ 14. Specifically, "Dyas grabbed Jackson's arm and pulled him from the doorway," while Malloy "bent down and pulled Jackson's leg." *Id.* The officers then "threw Jackson to the ground"

2

down eight concrete steps. *Id.* ¶ 16. The fall dislocated his collarbone. *Id.* After that, the officers handcuffed him. *Id.*

At that point, "other officers arrived at the scene." Am. Compl. ¶ 17. Jackson was then placed into a squad car and taken to the Justice Police Department. *Id.* ¶ 18. At the police station, Jackson complained of chest and shoulder pain, so he was taken to the hospital for overnight treatment. *Id.* ¶ 19.

The next day, Officer Dyas and another officer (it is unclear if it was Malloy) drove Jackson from the hospital to the Cook County Department of Corrections. Am. Compl. ¶ 20. During the car ride, Jackson "began having difficulty breathing because his dislocated collarbone was blocking his windpipe." *Id.* Jackson stuck his head out of the police car window to try to get more air. *Id.* When he did this, the officers stopped driving and removed Jackson from the car. *Id.* ¶ 21. (Jackson was still in handcuffs at this point. *Id.*) Dyas and the other officer "beat Jackson for several minutes," ultimately leaving him with three fractured ribs. *Id.* Jackson alleges that during the beating, he told the officers, "I can't breathe," and Dyas simply responded, "If you can talk, you can breathe." *Id.* According to Jackson, neither Dyas nor "the officers" did anything to "stop or report any officers' use of excessive force and failed to intervene during the battery." *Id.* ¶ 22.

After the beating, the officers "picked Jackson up, shackled his arms and legs and threw him horizontal into the police car." Am. Compl. ¶ 23. In addition to the three fractured ribs, Jackson was also left with a broken collarbone (it is unclear if this was a different injury from the broken collarbone he sustained the previous

3

night) and an injured anklebone. *Id.* ¶ 24. He had difficulty walking and had to wear a brace. *Id.*

According to Jackson, Dyas and the officers later tried to cover up their misconduct by falsely reporting that they had told Jackson he was under arrest and that Jackson had resisted arrest, which is why they had to use force on him. Am. Compl. ¶ 26. Jackson was not served with the order of protection—which was the ostensible purpose of the original encounter at his house—until November 2017, more than a year later. *Id.* ¶ 25.

Jackson now alleges that the Village of Justice is in part responsible for his injuries. Specifically, he claims that the Village failed to "adequately train, supervise, control, intervene, report, review, investigate, discipline and dismiss" its officers on the use of both excessive force and proper citizen's arrests. Am. Compl. ¶¶ 53-54. Jackson also claims more generally that the Village failed to even *have* adequate policies related to excessive force and citizen's arrests. *Id.* And finally, Jackson argues that the Village maintains a "code of silence," under which officers help cover up each other's misconduct. *Id.* ¶ 53.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests."

4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[2] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

Under *Monell v. Department of Social Services of New York*, a municipality can be held liable on a § 1983 claim only "when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible for under § 1983." 436 U.S. 658, 694 (1978). To state a *Monell* claim against the Village, Jackson must allege: (1) the deprivation of an underlying substantive constitutional right; (2)

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

the existence of an official policy or other governmental custom; and (3) that this policy or custom was the moving force behind the deprivation of his substantive constitutional rights.[3] *See Teesdale v. City of Chi.*, 690 F.3d 829, 833 (7th Cir. 2012). For the reasons explained below, Jackson has not adequately alleged the existence of a policy or custom, so the *Monell* claim against the Village must be dismissed, albeit without prejudice for now.

In order to adequately allege the existence of an official policy or custom, Jackson must point to (1) an express policy that, when enforced, caused a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, constituted a custom or usage with the force of law; or (3) a constitutional injury by a person with final policymaking authority. *McTigue v. City of Chi.*, 60 F.3d 381, 382-83 (7th Cir. 1995). Here, Jackson has chosen the second of the three routes: he alleges that although the Village has not explicitly and officially promulgated an unconstitutional policy, it has failed to train its officers and maintained an unwritten custom that caused the excessive force. The accusations can be broadly divided into two categories. First, there is the allegation that the Village not only failed to adequately train, supervise, and discipline its officers on excessive force and citizen's arrests, but also, relatedly, failed to even *have* "adequate" policies in the first place. *See* Am. Compl. ¶¶ 53-54. The Court will analyze these allegations as a group because they all rest on a claim of failure or inadequacy, as

---

[3]The parties have not really briefed the "constitutional deprivation" element of the *Monell* claim, so the Court does not address that issue here and assumes for purposes of this motion that the underlying alleged constitutional deprivations—Jackson's excessive-force claims against Dyas—are valid.

6

opposed to a claim that some affirmative policy has caused injury. Then, separately, Jackson alleges that the Village maintains a code of silence, which "serves to ratify … and authorize" officer misconduct. *Id.* ¶ 53.

The Village moves to dismiss on the basis that Jackson has failed to identify "any other circumstance in which Dyas or other Village of Justice police officers engaged in unconstitutional conduct, and were not reprimanded, disciplined, or criminally prosecuted, or where there was a code of silence." R. 50, Def.'s Br. at 6. The Village argues that Jackson only identifies a single instance of "unconstitutional conduct arising out of his *own* arrest," which is not enough to conclude that there thus must have been a Village *policy*. *Id.* at 5 (emphasis added). In response, Jackson points out that he is "not required to identify every other or even one other individual" who has suffered the same constitutional injury in order to establish that the Village had these policies (or failed to have these policies) in place. R. 56, Pl.'s Resp. Br. at 1 (citing *White v. City of Chi.*, 829 F.3d 837, 844 (7th Cir. 2016)).

Generally speaking, Jackson is right that there is no blanket rule that *Monell* plaintiffs must always allege multiple instances of unconstitutional conduct in order to show that a policy exists. There are certainly contexts in which an allegation of a single instance of wrongdoing is enough to support an inference that a more *systemic* policy or custom exists. For example, in the medical-treatment context, a single allegation that a jail doctor refused to perform a procedure and explained to the detainee that the municipality *never* allows that particular procedure might be enough to support an inference of a systemic policy or custom. Similarly, in *White v.*

7

*City of Chicago*, a Seventh Circuit case which both parties cite, the plaintiff was challenging an arrest-warrant application policy premised in part on a "standard printed form that does not require specific factual support for an application for an arrest warrant." 829 F.3d at 844. The Seventh Circuit held that the form's lack of a factual-support section (coupled with the plaintiff's description of his individual experience) was enough to allege that a widespread policy existed. *Id*. The fact that a "standard form" was used in one particular instance could support a reasonable inference that that standard form was also used in all or many instances.

But Jackson's case arises in a different context from these examples. To repeat, it is true that there is no blanket requirement that a *Monell* plaintiff must allege multiple instances of wrongdoing. But context matters. In some cases—like Jackson's—the nature and specifics of the underlying constitutional claim demand that more than one instance *is* needed to make out a plausible inference for the existence of a widespread but unwritten policy or custom. Here, Jackson's allegations are really much more specific to him, rather than suggestive of a more systemic practice. Jackson is essentially arguing that because he was subjected to excessive force by Officer Dyas (and a few other officers) in October 2016, then that means the Village as a whole has a widespread policy or custom in which officers are not trained, supervised, or disciplined, or, alternatively, that the Village simply does not maintain any "adequate" policy whatsoever on excessive force or proper arrest procedures. But that is too large of a logical leap to make. This is unlike *White*, for instance, where

8

evidence of a systemic problem (the inadequate warrant-application form) was embedded in the plaintiff's individual experience.

Here, Jackson's allegations only go so far as to specify that he himself suffered excessive force at the hands of a few officers. To be fair, he does allege that based on "information and belief," both Officer Dyas and other Village of Justice officers have "a history of violating constitutional rights of citizens, including but not limited to civilian misconduct complaints." Am. Compl. ¶¶ 31-32. But he does not tie this alleged "history" of misconduct to any sort of broader policy, nor even any failure to discipline Dyas on an individual level. (For instance, there is no allegation that Officer Dyas had managed to escape discipline on previous civilian-misconduct complaints.) Similarly, there are no factual allegations (as opposed to conclusory allegations) linking the alleged misconduct of the individual officers in this case to any of the other alleged policies or customs in the amended complaint (such as failure to train, supervise, or maintain adequate policies). So the *Monell* claim on these theories must fail.

It is also worth mentioning that to the extent that Jackson is pursuing failure to train, supervise, and discipline theories, the substantive bar is even higher: "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). *See also Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 599 (7th Cir. 2019) ("Failure-to-supervise claims, like failure-to-train claims, are a tenuous form of *Monell*

9

liability" and require deliberate indifference); *Cazares v. Frugoli*, 2017 WL 1196978, at \*19 n.16 (N.D. Ill. Mar. 31, 2017) (noting that federal courts have applied the deliberate indifference standard to failure-to-discipline claims). In the municipal liability context (as distinct from Eighth Amendment prison-conditions cases), deliberate indifference means the Village "(1) failed to provide adequate training in light of foreseeable consequences; or (2) failed to act in response to repeated complaints of constitutional violations by its officers." *Miranda v. Cty. of Lake*, 900 F.3d 335, 345 (7th Cir. 2018) (cleaned up). That is, the Village must have been on "actual or constructive notice of a problem." *Id.* Here, Jackson has not met that high bar. The allegations in his current complaint do not support a plausible inference of deliberate indifference on the part of the Village.

The code-of-silence allegation is a much closer call. The theory here is that the Village maintained a policy or custom in which officers help cover up police misconduct and intentionally do not intervene in each other's wrongdoing. *See* Pl.'s Resp. Br. at 2. Reading the Amended Complaint generously, Jackson technically alleges two separate instances during which at least two different Village of Justice officers failed to intervene when Officer Dyas beat him. Am. Compl. ¶¶ 14, 16, 21-22. At the end of the day, however, these allegations are still premised on Jackson's individual experience. At most, Jackson has sufficiently alleged that in *his* particular case, Officer Dyas and his partners helped cover up each other's wrongdoing—but this is not enough to plead *Monell* liability. And again, this is not to say there is a blanket requirement that § 1983 plaintiffs must always allege multiple narratives of

misconduct in order to successfully allege a policy or custom. But in *this* case, based on these facts, there is not enough to connect the dots between what happened to Jackson and his conclusion that the Village as a whole maintained a widespread policy or custom where officers routinely cover up each other's crimes.

For all these reasons, Jackson has failed to adequately allege the existence of a policy or custom, and the *Monell* claim against the Village must be dismissed. That being said, the dismissal is without prejudice (even though Jackson has already amended his complaint once). Specifically, Jackson is authorized to take discovery "from the ground up," which means he may still try to establish the existence of a policy or custom through discovery from the *individual officers* about what they personally know. So, for instance, he is free to ask Officer Dyas questions about whether he has ever had training on excessive force, and if so, what kind of training. Those are the sorts of questions that a plaintiff is allowed to ask in exploring individual-officer liability, and they can also be the basis for a viable set of *Monell* allegations. (In contrast, Jackson is not permitted at this point to engage in broad-based *Monell* discovery against the Village itself.) Depending on the types of admissions he can elicit, Jackson might be able to then build a viable *Monell* claim.

The same also applies to the code-of-silence claim. Jackson may ask questions about the existence of a code of silence (which the officers will likely deny), and then he can try to elicit the disciplinary histories of individual officers, which could produce enough facts to state a *Monell* code of silence claim at the pleading stage. *See, e.g., Spearman v. Elizondo*, 230 F. Supp. 3d 888, 892 (N.D. Ill. 2016) (allowing code-of-

silence claim to survive where conclusory assertions were buttressed by numerous factual allegations); *Baskins v. Gilmore*, 2018 WL 4699847, at *6 (N.D. Ill. Sept. 30, 2018) (allowing code-of-silence claim to survive where conclusory allegations had a factual foundation).

One final point: just because the *Monell* claim against the Village has been dismissed (for now), that does not mean that Jackson is barred from later arguing at *trial* (if things get that far) that these particular individual officers had a motive to cover up each other's wrongdoing. In other words, today's holding just means that Jackson has not alleged enough to support an inference of an actual *policy or custom* spanning the entire Village of Justice Police Department. When it comes to individual officers or groups of officers, though, Jackson is still free to argue that a cover-up existed in his particular case and that the officers were motivated to do so because they worked together.

## IV. Conclusion

The *Monell* claim against the Village of Justice is dismissed without prejudice. In light of Second Amended General Order 20-0012, the status hearing of April 28, 2020 is reset to May 27, 2020 at 9:30 a.m.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2020